PENNEY & LONG, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 17908.   Promulgated February 6, 1929.

*E. S. Parker, Esq.*, and *Jesse I. Miller, Esq.*, for the petitioner.
*H. LeRoy Jones, Esq.*, for the respondent.

234

OPINION.

LITTLETON: There is no dispute between the parties as to the consideration received in the sale of the distributor's contract to the American Southern Motors Corporation. The parties agree that the fair market value of the stock was $50,125. The petitioner contends that the contract had an actual cash value at the date it was acquired from the predecessor partnership of $38,000, and that the profit realized upon the sale of this contract to the American Southern Motors Corporation did not exceed $12,125. It contends also, that it is entitled to have this contract included in invested capital at a value of $38,000, subject to the limitations applicable to intangible properties paid in for stock. The Commissioner argues that petitioner has failed to show that the contract had any value at the date it was acquired by the petitioner and, consequently, the entire con-

sideration received in the sale to the American Southern Motors Corporation must be treated as profit. He argues further, that whether the contract had any value or not when acquired by the petitioner, the provisions of section 331 of the Revenue Act of 1918 preclude the inclusion in invested capital of any value whatever for the contract, because it was acquired without cost to the same persons who, after the transfer of the contract to the petitioner, continued to own or control an interest therein of 50 per centum or more.

In the submission of its appeal, the petitioner, for proof as to the actual cash value of the contract at the date of acquisition, relied entirely upon sales of the same class of stock as that which was issued for the contract, and the judgment of its board of directors as expressed in the resolution authorizing the purchase of the assets of the predecessor partnership. The petitioner contends that the sale of a substantial block of its " Class A" stock for cash, at par, establishes the value of the " Class A" stock issued for the contract and other assets of the predecessor partnership and, *a fortiori*, the value of those assets; and that the judgment of its directors, in the absence of proof of fraud, in declaring the assets of the partnership to be worth $50,125, and in issuing fully paid and nonassessable shares of stock of a like par value in payment therefor, should be accepted as conclusive of the value of the assets acquired from the partnership.

There are several reasons why we believe the petitioner's contentions must fail. In the first place, assuming the stock issued by petitioner for the partnership assets had a fair market value equal to par, how are we to determine what part of this stock was issued in payment for the contract in question? The evidence discloses that the partnership assets, in addition to the contract, included cash in bank, accounts receivable, notes receivable, inventory of used cars, and furniture and fixtures, and there is not one iota of evidence as to their value. And we would be confronted with the same problem if we accepted the directors' declaration as to value since the value declared is the directors' judgment as to the value of all the assets, and not the contract alone. One of the members of the partnership testified that the partners " considered " that $12,000 of the total of $50,125 par value of stock issued to them by the petitioner for the partnership assets was in payment for the tangible assets and a return of their contributions to the partnership capital, and that $38,125 was in payment for the contract. He admitted, however, that there was no discussion or appraisal of the contract value by the partners, who were acting in the dual rôle of vendors and agents for the vendee. The statement is a vague self-serving declaration without the least support whatever. So, if the contention of the petitioner as to the fair market value of the stock issued for the partnership assets could be granted, and that value fixed as the fair value of the assets, not

knowing what part of the total stock issued was in payment for the distributor's contract, we still would be unable to determine the cost or cash value of the contract when acquired.

Furthermore, we do not believe that the sales of " Class A " stock for cash, at par, though substantial in the aggregate, establish in the circumstances of this case, the fair market value of stock, of the same class, which was issued for the partnership assets. The evidence discloses that the purchasers of this stock were relatives, intimate friends and business associates of the former partners. It appears that none of them made any independent personal investigation as to the wisdom of their investments, and that they were guided entirely in their actions by the representations made to them by the former partners and organizers of petitioner company, in whose reputation, sagacity, and business abilities they had the utmost confidence. The witness, Bush, testified that he bought some of this stock "largely on the personal reputation of the managers of the company and hopes for the future of the industry in Greensboro " and "the representations satisfied me it was a good investment." The witness, Brawley, stated: " Of course I know a lot more about buying stocks than I did then, but if I was going to buy stock to-day the first thing I would want done was to have it analyzed by a man who knew his business, but I did not do it at the time. I had only invested in foreign stocks; and I did this more on the personality of the people behind it and good business and things of that kind." The witness, Kelly, testified that he formed no opinion of the value of the contract, but "relied on the reputation of Mr. R. J. Mebane;" that he purchased the stock "solely on the personality of Mr. R. J. Mebane and his representations as to future prospects." The witness Brooks stated that he made no investigation of petitioner's affairs or its assets before he made a purchase of petitioner's stock, and that " I think I relied on the statement of Jess Mebane and Long." Not a share of this stock was offered for sale on the general market; all sales were entirely private in character, and in them filial and friendly relationships and personalities appear to have been the dominating factors motivating the transactions. The facts given to us present no plausible reason for believing that had the entire issue of " Class A" stock been thrown on the general market, a price would have been realized equivalent to par. In the light of the circumstances surrounding these sales, we are not convinced that they establish a fair market value for the stock given in exchange for the partnership assets. Cf. *S. T. Swenson, Executor*, 14 B. T. A. 675; *Hershey Manufacturing Co.*, 14 B. T. A. 867.

It appears that the contract, or a copy thereof, is not now available, and we have been given but the most meagre details, and then, only those favorable to the petitioner. Perhaps it contained no disadvan-

tageous provisions, but contracts are based upon the mutual promises and undertakings of the parties. What obligations did the petitioner assume under the contract, and was their nature such as to impose no hardship? Was the petitioner so situated as to be enabled to carry out its undertakings? What were the prospects of reasonable performance on the part of the American Motors Corporation? All of these it would appear could be answered without the presence of the contract.

The most favorable statement of the evidence from the petitioner's standpoint which can be made is that the petitioner considered the contract a most favorable one and, based upon the knowledge of the success of distributors of other makes of automobiles doing business under somewhat similar contracts, hoped for a like success of its own venture, and that its organizers were sufficiently enabled to impress their ideas and personalities upon close associates as to induce the latter to purchase a part of petitioner's stock at par. The testimony of two of the former partners leaves no doubt as to the enthusiasm or degree of confidence with which they embarked upon the venture made possible by this contract. But what were the reasons for their great optimism? We were told that the territory allotted under the contract was excellent, that the discount of 28 per cent off list price was an exceptionally favorable one, and that there was a shortage of cars, and there the story ends. We know very little about the American Motors Corporation, and the prospects as to its ability to carry on its part under the contract. That someone told one of the witnesses that it was in good condition, but needed a little capital, and that a change in model of car which proved to be mechanically unsatisfactory brought about a condition which resulted in the company "going broke," is substantially all that was told to us about that company. We know nothing whatever about the car it produced. Certainly the name "American Balanced Six" is not so established in the public mind, or the general characteristics of the car produced under that name so well known that, for quality and utility, we can accord it a place of favorable comparison with other well known makes of cars.

From the time the partnership acquired this contract until it disposed of it to the petitioner, 14 or 16 cars were sold in the allotted territory of 6 or 7 southern States. We know nothing whatever as to what the petitioner accomplished or realized under the contract from the time it was acquired from the partnership until disposed of to the American Southern Motors Corporation.

We are unable to determine from the evidence the value of the contract at date of acquisition, and, consequently, we may not disturb the Commissioner's determination as to the profit realized upon the sale of the contract.

238

In addition to our inability to determine the actual cash value of the contract, at date of acquisition, there is the further consideration that any revision of Commissioner's determination as to invested capital is precluded by the provisions of section 331 of the Revenue Act of 1918. It is clear that this contract was acquired by the partnership without cost, and that after it was transferred to petitioner, in 1919, the former members of the partnership, through their holdings of stock in the petitioner company, continued to own or control an interest in the contract of 50 per centum or more. Under these circumstances, the contract may not be included in petitioner's invested capital at any value.

*Judgment will be entered for the respondent.*